IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Cr. No. 16 CR 4711 JCH |
| | ) | |
| vs. | ) | |
| | ) | |
| DAVID ALLEN HICKMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## **UNITED STATES' SENTENCING MEMORANDUM**



*The Carlisle Condominiums – November 23, 2016.[1]*

Defendant David Hickman is a very dangerous man.

Over the course of ten-day span in November 2017, in the dark of night, Defendant

Hickman terrorized residents of Albuquerque through a series of a violent acts in which he

---

[1] Two short videos showing the extreme intensity of the Carlisle Condominiums' fire as it was raging, and firefighters struggling to contain it, are provided as Exhibit 1. All video exhibits are contained on a separate DVD for the Court.

targeted wholly innocent victims.  Defendant Hickman's actions were deliberate and premeditated.  A serial arsonist, he appears to have acted out of sheer evil or malice, or from some twisted sense of excitement or thrill.[2]  Whatever the case may be, that part of Defendant Hickman's moral compass that is broken and warped remains just as broken and warped today as it was on the day he was arrested fleeing the fire he had just started at the Old Navy clothing store – dressed entirely in black and armed with a target list, a high-powered assault rifle, a handgun and a car filled with improvised Mason jars.  Absent outstanding police work by the Albuquerque Police Department, and a lucky break, there is no knowing how many more places and lives the defendant would have placed in jeopardy before he was stopped.

The public today rightfully has zero tolerance for accepting the dangers posed by a heavily armed gunman who is determined to lash out violently.  The public expects to be protected from a man prowling their city night after night, while firing an assault rifle and handgun and throwing incendiary devices, with another assault rifle and the components for a machine gun, and thousands of rounds of ammunition at his home, together with military manuals about explosives and guerrilla warfare.  Defendant Hickman should not be given another opportunity to unleash another violent crime spree upon this or any other city.  The public deserves maximum protection from the extremely dangerous, volatile, irrational and unpredictable threat that Defendant Hickman has indisputably proven to be.  In this case, maximum protection means imposing nothing less than a sentence of 20 years' imprisonment.

The United States recognizes that the Probation Office has calculated Defendant Hickman's advisory guideline range to only call for a sentence of 63 to 78 months'

---

[2] When asked at the time of his arrest, the defendant declined to provide agents with any explanation for his violent attacks.  PSR at 12.  The United States does not know the defendant to have any diagnosable disorders.

imprisonment.  However, such a sentence would obviously fall woefully short of capturing the full circumstances of the defendant's offenses, the harms he inflicted, and the dangers he would continue to pose to the community if he were released.  For these reasons, the United States urges this Court to accept the Federal Rule of Criminal Procedure 11(c)(1)(C) plea agreement between the parties and proceed to sentencing.  As this Court is well aware, the plea agreement frees this Court to impose up to a 20-year term of imprisonment that is wholly independent from the advisory guideline range.

## ARGUMENT

This memorandum addresses how the sentencing factors of 18 U.S.C. § 3553(a) overwhelmingly favor sentencing Defendant Hickman to a 20-year term of imprisonment,[3] or the high end of the agreed-upon sentencing range in the plea agreement.  Within the context of the Rule 11(c)(1)(C) plea agreement, however, the United States first examines how traditional arguments for departing or varying under the guidelines also support this Court imposing the maximum sentence permitted under the plea agreement.  That the § 3553(a) objectives and a more traditional guidelines-oriented analysis both trend toward the same end result is not surprising, of course, given "that the sentencing statutes envision both the sentencing judge and the [Sentencing] Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale."  *Rita v. United States*, 551 U.S. 338, 348 (2007).  Nonetheless, the

---

[3] One way to achieve this outcome is for this Court to exercise its freedom under 18 U.S.C. § 3584(a) to impose at least some consecutive, as opposed to entirely concurrent, sentences in this case.  Indeed, considering the defendant's conduct as separate and distinct blocks of harm deserving of separate punishment makes logical sense in this case and adds some helpful sentencing perspective.  Nonetheless, in making the determination to impose concurrent sentences, the United States is aware that this Court is required to consider the same sentencing factors of § 3553(a) mentioned above.  18 U.S.C. § 3584(b).

United States first references the more traditional methodology for departures and variances simply to help explain why the defendant's guideline range contained in the presentence report is not even useful as a starting point for consideration of the defendant's sentence under the plea agreement. Of course, highlighting reasons why the guidelines calculation in the presentence report does not serve as a useful reference under the plea agreement also helps make clear why the § 3553(a) objectives do compel a 20-year term of imprisonment.

With the above caveat, if this case were governed by the guidelines instead of the plea agreement, there would be several encouraged grounds for upward departure. For example, the commentary to USSG § 3D1.4 states that courts may depart when, as here, the guidelines fail to ensure appropriate additional punishment for serial crimes. USSG § 3D1.4, Background. The presentence report (PSR) also identifies several other encouraged grounds for departure, including Defendant Hickman's extensive use and possession of dangerous weapons under USSG § 5K2.6, the exceptional amount of property damage or loss he inflicted under USSG § 5K2.5, and the exceptional endangerment to public health and safety under USSG § 5K2.14 that Defendant Hickman caused. *See* PSR at 32-33.

### A. Traditional grounds for varying or departing from the guidelines' multiple count adjustment rules

As part of his plea agreement, Defendant Hickman has pled guilty to five counts of arson under 18 U.S.C. § 844(i) and, as part of the factual basis supporting his guilty pleas, he has admitted to committing, or attempting to commit, an additional four other arson crimes, for a total of nine arson crimes. Had he not been stopped, it is also obvious that the defendant's violent crime spree would have continued indefinitely.

By law, a single conviction under § 844(i) carries a mandatory minimum term of imprisonment of not less than five years, and a maximum penalty of not more than 20 years.

4

Every conviction thereafter carries the same minimum mandatory five-year penalty.  Simple

logic might suggest, therefore, that an individual who chose to commit two arsons rather than

one would face at least twice the minimum penalty of a single arson (*i.e.,* ten years'

imprisonment), and that multiple arsons would be subject to a similar multiplier.  Alas, that is not

the result under the guidelines.  Instead, after applying the multiple count adjustment rules of the

guidelines in this case, Defendant Hickman's total offense level settles to a mere level 26, *see*

PSR at 23, ¶¶ 112-119, resulting in an astonishingly low advisory guideline imprisonment range

of only 63 to 78 months, *id.* at 29, ¶ 158.

　　　　In fact, because of the way the guidelines' multiple count adjustment rules work, the

advisory guidelines only take into account the first six arson crimes that Defendant Hickman

committed.  That seemingly illogical policy choice is addressed below.  But even setting aside

that, for whatever reason, the multiple count adjustment rules establish a ceiling that effectively

shields and protects the most prolific and/or dangerous serial arsonists from receiving any

additional punishment after they commit six arsons, the additional penalty that the guidelines

suggest should apply to an arsonist for committing his first five additional arsons is also

shockingly low.  It means that the guidelines effectively would have dictated that Defendant

Hickman would have only faced the full force of the minimal five-year statutory penalty for

committing his first arson, while the total additional punishment he faced for having committed

(or attempting to commit) his next eight arson crimes would have been the bare hand slap of a

total of three additional months at the low end of the advisory guideline range, and a total of 18

months at the high end of the guideline range.

　　　　This result defies both logic and reason.  At the *high end* of the guidelines range, it

essentially means that after serving the statutorily mandated five years (or 60 months) for his

first arson crime, Defendant Hickman would have been sentenced to serve only 3.6 months

apiece (or only 6% of the amount of time for his first crime) for each of his next five arsons, with

*no* additional time for any arson that the defendant set after his sixth crime.  In other words, the

*high end* of the advisory guideline would suggest that Defendant Hickman should receive a *94%*

*reduction* in his punishment from his first crime for each arson crime he committed after his first

crime, until he earned a 100% "free-crime" discount for each arson after his sixth arson.

        The guidelines' multiple count adjustment rules obviously make sense in other contexts,

but they would not make rational sense in this case.  For example, imposing only marginal

additional punishment may make sense in the context of a series of drug or financial transactions

that could be viewed as cumulating in only moderate additional damage, but that logic does not

hold true in this instance.  Here, the guideline presumes that when a serial offender continues to

strike, there are diminishing returns in imposing as punishment for the additional crimes either

the same degree, or an increased degree, of punishment beyond that imposed for the first crime.

Instead, the guideline provides that only nominal additional punishment that tapers to *no*

additional punishment whatsoever for any crime committed beyond the sixth offense is

appropriate, with such diminished punishment presumably being viewed as in lockstep with the

sentencing goals of § 3553(a).  But common sense shows the opposite is true here.

        For example, if this Court followed the multiple count adjustment rule, at the high end of

his guideline range, Defendant Hickman would effectively be sentenced to a paltry 3.6 additional

months of imprisonment as punishment for having burned out the building housing Project

Defending Life with its place of worship therein – because chronologically that fire was the

second fire that Defendant Hickman is known to have started.  In similar fashion, Defendant

Hickman would have only faced an additional 3.6 months imprisonment for his third known fire,

which was the conflagration at the Carlisle Condominiums that placed lives at risk and resulted in more than $8 million in damages – with the same pattern of grossly inadequate punishment playing out for each of the remaining arson offenses for which Defendant Hickman is responsible.

In fact, as noted above, it is frankly acknowledged in the guidelines that, in some instances, the grouping rules will result in insufficient punishment for serial offenses. Thus, under the background commentary to USSG § 3D1.4, sentencing courts are encouraged to depart upward when the guidelines fail to ensure adequate punishment for serial offenses. USSG § 3D1.4, <u>Background</u>. In *United States v. Martinez*, 418 F.3d 1130, 1134 (10th Cir. 2005), for example, the Tenth Circuit upheld an upward departure where the sentencing court found that the guidelines grouping rules essentially assessed no punishment for the last four bank robberies of a crime spree. However, because the sentencing judge in *Martinez* only departed and did not also vary, the court added only an additional guidelines level apiece for each of the last four robberies in the defendant's crime spree, corresponding to the additional number of levels that would normally have been assessed under the guidelines for those robberies. *Id.*

However, the approach taken in *Martinez* of simply departing upward one level for each of the last three arson crimes for which the grouping rules provide that Defendant Hickman should receive no punishment – as opposed to also varying – would still have resulted in inadequate punishment in this case. Under the *Martinez* approach, Defendant Hickman would have received 60 months' punishment for his first arson crime and, assuming he was sentenced at the high end of the advisory guideline range, still would have received only six months

additional imprisonment apiece for the next eight crimes he committed, or a still illogical *90% reduction* from the punishment imposed for his first offense.[4]

Viewed another way, even adopting the *Martinez* approach would have been inadequate in this case because, as discussed below, nearly all of the § 3553(a) sentencing factors – including the need to reflect the seriousness of Defendant Hickman's offenses, to deter the defendant, and to protect the public from future danger – still overwhelmingly weigh in favor of subjecting the defendant to greatly *increased*, not decreased, punishment for each of his serial offenses.

Indeed, the Supreme Court has recognized that where district courts view advisory guideline policy choices – such as the amount of additional punishment allotted for serial harms – as illogical or unfair in practice, sentencing judges are free to vary from them.  *See, e.g., Kimbrough v. United States,* 552 U.S. 85, 101 (2007); *United States v. Lente*, 759 F.3d 1149, 1163 (10th Cir. 2014) (upholding variance from 46 to 57 months imprisonment to 192-month sentence based "in significant measure" upon judge's finding that the guidelines' six month imprisonment sentencing increase per victim was not sufficient "to reflect the seriousness of the offense" under § 3553(a)(2)).  In sum, in this case, even if his plea agreement did not exist, a substantial variance to ensure that Defendant Hickman received punishments for his subsequent arson crimes that were much closer to the five-year sentence he is required to receive for his first arson (culminating in a total sentence of 20 years' imprisonment for all of his crimes) would

---

[4] This is calculated by adding three levels to Defendant Hickman's current offense level of 26, resulting in an adjusted offense level of 29 with a corresponding advisory guideline range of 87 to 108 months.  After subtracting 60 months from the 108 months at the *top* of the guideline range that means that Defendant Hickman would have only faced a total of an additional 48 months imprisonment, or six months additional imprisonment apiece for eight separate arson crimes.

have been warranted to accurately reflect both the true level of seriousness of Hickman's past

crimes, as well as the extreme level of dangerousness he poses to this day to the public outside of

prison.

**B.** **Traditional grounds for varying and departing based upon Defendant Hickman's use of weapons and dangerous instrumentalities**





*From top left, clockwise: a KS-47 68-mm assault rifle, a .45 caliber pistol, a Springfield M1A rifle, and the lower receiver from an Uzi.*

There can be little gainsaying that a successful arson, standing alone, can be a dangerous

crime under almost any circumstance.  Arson is a crime that not only destroys property, but may

also put innocent people's lives at risk.  Fires can become infernos, quickly spiraling and raging

out of control.  In this case, however, Defendant Hickman also chose to use high-powered

firearms and homemade destructive devices that transformed his arson crimes into an even more

dangerous, combustible and volatile mix.  In summary fashion, paragraphs 177 and 178 of the

PSR outline just some of the many ways in which Defendant Hickman used and possessed these

items.  Defendant Hickman both used a KS-47 68-mm assault rifle and a .45 caliber pistol and possessed a Springfield M1A rifle and parts of an Uzi machine gun.

    As recited in the PSR, the use or possession of weapons or other dangerous instrumentalities during the commission of an offense is an encouraged ground for departure under USSG § 5K2.6.  Moreover, the actual discharge of a firearm under § 5K2.6 is a factor that can "warrant a substantial sentence increase."  *Id.*  In his plea agreement, Defendant Hickman admitted how he repeatedly discharged firearms to blast his way into buildings so that he could set them afire.  *See* Doc. 35 at ¶9.c.,h.,j., and l.  However, the admissions that Defendant Hickman made in his plea agreement do not come close to accounting for all of the rifle shots that Defendant Hickman actually fired.  In fact, video surveillance tapes available from some of the crime scenes, together with rifle cases that agents found, establish that Defendant Hickman discharged his high-powered assault rifle at least *23 times* over the course of his arson attacks within the city.[5]  He also fired his handgun at least twice inside the Old Navy store.[6]  Each of these firearm discharges obviously occurred within the city environs of Albuquerque, often, if not always, near neighborhoods or city streets, or in the case of the Old Navy fire scene, close to

---

[5] Agents were able to find five rifle cases at the Starbucks located on Central Avenue, one rifle case at the Starbucks located on Gibson Boulevard, four rifle cases at the Starbucks located on Lomas Boulevard, three rifle cases at the Barnes & Noble bookstore, six rifle cases at the Shred-it fire scene, and four rifle cases and two handgun cases at the Old Navy fire scene.  The United States can provide the Court with a copy of the FBI Laboratory's report from its Firearms/Toolmarks Unit that catalogues the great volume of ballistics material gathered in connection with this investigation.

[6] One can see the plate glass suddenly explode at the Old Navy store as Defendant Hickman blasted it with his assault rifle in the surveillance video attached hereto as Exhibit 2 at approximately minute 03:30.  One can next see Defendant Hickman enter into the store, with his rifle across his back and his pistol in his right hand.

Interstate 25, a busy thoroughfare that has traffic at any time of day or night.[7]  The evidence also

showed that, in at least one instance, Defendant Hickman fired a rifle round into a propane tank.

He was successful in puncturing the tank, but he failed to cause it to explode. Defendant

Hickman had set the propane tank up inside the Starbucks coffee shop on Central Avenue, after

he had thrown an open jug of kerosene inside the structure and smashed several mason jars filled

with gasoline inside the shop.[8]

One ready measure and analogy as to the gravity and amount of weight that the

guidelines place upon even a single discharge of a firearm during the course of a crime can be

found at USSG § 2B3.1, the guideline for robbery, extortion and blackmail offenses.  Under §

2B3.1(b)(2)(A), if a firearm is discharged even once as part of an offense, the guidelines call for

a 7-level increase in the defendant's guideline range (with slightly declining increases for

defendants who merely use, brandish or possess firearms as part of an offense).[9]

---

[7] *See* Exhibit 3, attached hereto, which shows overhead images of some of the areas in the city
where Defendant Hickman fired his assault rifle.

[8] Surveillance video of the Starbucks located on Central Avenue where Defendant Hickman fired
into the propane tank with his assault rifle is attached hereto as Exhibit 4.  On the video, one first
can see the shots fired into the building that allowed Defendant Hickman to enter it at
approximately minute mark 00:30. Later, at approximately minute mark 01:40, one can see the
defendant exit the coffee shop after he had spread flammable material throughout.  He then
returns with the propane tank, at approximately minute mark 02:15, setting it on a counter.  One
can next see the defendant leave the building.  Shortly thereafter, at about minute mark 02:40,
the propane tank can be observed as it is struck by a rifle round and shot off the counter.

[9] USSG § 2B3.1(b)(2) reads, in pertinent part, as follows:

> (A)      if a firearm was discharged, increase by 7 levels; (B) if a firearm was
> otherwise used, increase by 6 levels; (C) if a firearm was brandished or possessed,
> increase by 5 levels; (D) if a dangerous weapon was otherwise used, increase by 4
> levels; (E) if a dangerous weapon was brandished or possessed, increase by 3
> levels.

USSG § 2B3.1(b)(2).

11



*A propane tank component of one of the defendant's IIEDs recovered from a Starbucks coffee shop*

Of course, in addition to adding a high-powered assault rifle and handgun into the already volatile mix of his criminal behavior, Defendant Hickman further incorporated Improvised Incendiary Explosive Devices (IIEDs), also known as destructive devices or homemade bombs, into his crime spree.  The Explosives Unit at the FBI Laboratory produced reports in which the FBI detailed how the remains of IIEDs were identified at the arson sites located at Project Defending Life, the Starbucks location on Broadway Blvd., and the Starbucks location on Lomas Blvd.  Those reports are attached hereto as Exhibits 5 through 7.[10]  In addition, to illustrate the type of improvised liquid containers (*i.e.,* Mason jars with rope handles, filled with ignitable liquid like gasoline or kerosene) that Defendant Hickman used at the Old Navy arson site, the FBI Explosives Unit laboratory report of that site is also attached hereto as Exhibit 8.  The defendant used similar liquid containers at several other sites, including the Carlisle Condominiums site and the Barnes and Noble bookstore, as reflected in the images of the remains of such devices at both sites that are among the images attached hereto respectively as

---

[10] The United States does not expect or request the Court to closely scrutinize any of the FBI laboratory reports it has attached to this memorandum.  Rather, the Court may simply find it helpful to briefly peruse the images contained within the reports to better understand the nature of the IIEDs the defendant constructed.

Exhibits 9b and 10b-c. Should the Court request, the United States can also provide a copy of the FBI laboratory report identifying all of the different incendiary or explosive chemicals used at each of the arson sites.

Citing USSG § 5K2.6, the Tenth Circuit has observed that "the uncontrollable nature of many explosives, which can result in indiscriminate destruction and slaughter, is sufficient in itself to justify departure." *United States v. Baker*, 914 F.2d 208, 210-11 (10th Cir. 1990). "It is undisputable that explosive devices are extremely dangerous when used as a weapon and that their use can lead to a substantial endangerment of others, including bystanders and people in adjacent, and possibly even remote, areas of the structure." *Id.*

Moreover, for purposes of analogizing guidelines' departures to the punishment hierarchy of § 2B3.1, it is noteworthy that the Tenth Circuit in *Baker* observed that explosives can actually be more destructive than firearms. *Id*. At a minimum, this suggests that the Tenth Circuit would agree that explosives would justify at least as many additional guideline level increases as those contemplated for firearms' enhancements under § 2B3.1.

Of course, any guidelines' analogies for the amount of increased punishment that should apply when a defendant introduces firearms or other dangerous weapons as an element of his criminal activity pale in comparison to the ready analogies that can be made to the penalties for the discharge, use and possession of firearms and/or destructive devices during and in relation to crimes of violence under 18 U.S.C. § 924(c).[11] For example, under § 924(c), if a firearm is

---

[11] In recent years, of course, ascertaining whether a crime qualifies as either a "violent felony" or "crime of violence" has become far more difficult and unpredictable. *See, e.g., Mathis v. United States*, 136 S. Ct. 2243, 2266-7 (2016) (Alito, J., dissenting) (analogizing the Supreme Court's jurisprudence for ascertaining violent felonies to the real-life story of a Belgian driver who set off on a trip to the airport that should have taken an hour, but instead became a trip lasting more than two days and 900 miles, as the driver ignored common sense and unquestioningly kept following her GPS navigation device). For example, the Ninth Circuit in *Jordison v. Gonzales*,

discharged as an element of the crime, then a defendant is subject to a mandatory ten-year term of imprisonment in addition to the punishment for his underlying crime. *See* 18 U.S.C. § 924(c)(1)(A)(iii).  Moreover, if a defendant is convicted for a second § 924(c) crime, that crime carries an additional mandatory 25-year term of imprisonment, *see* 18 U.S.C. § 924(c)(1)(C)(i), unless a destructive device is the basis for the second conviction, in which case the defendant is subject to a mandatory term of life imprisonment, *see* 18 U.S.C. § 924(c)(1)(C)(ii).  In sum, the heavy penalties that apply in firearms cases to conduct that is otherwise identical to Defendant Hickman's conduct in this case suggest that a 20-year term of imprisonment for Defendant Hickman is more than reasonable and justified.

C. **Traditional grounds for varying and departing based upon the exceptional damage or losses that Defendant Hickman caused**

The PSR identifies the millions of dollars in property loss that the defendant caused as another factor that might have warranted a departure in this case had there not been a plea agreement.  PSR at ¶ 176.  While there is admittedly a component of the arson guideline that cross references the amount of monetary damage inflicted that can sometimes be used to establish an arsonist's base offense level, that provision was not used to establish Defendant Hickman's base offense level.[12]  This is because the arson sites Defendant Hickman targeted

---

501 F.3d 1134 (9th Cir. 2007) held that an alien's conviction under California law for setting fire to a structure or land did not constitute a conviction for a crime of violence under 18 U.S.C. § 16(b) because, unlike the state arson statute at issue, §16(b) requires a risk that physical force be used against the person or property of another. In other words, whether arson qualified as a crime of violence turned solely on the technical question of whether the relevant arson statute was expansive enough to encompass burning down one's own structure.  If so, under the Ninth Circuit's construction, the conduct at issue would not be considered a crime of violence, even if it was undisputed that the actual conduct consisted of burning down property belonging to another person.

[12]  The amount of monetary damage done in an arson can be used to establish a defendant's base offense level under USSG § 2K1.4(a)(4).  Here, assuming a total loss of approximately $13

qualified as "place[s] of public use" under USSG § 2K1.4(a)(1)(B), which triggered the greater

base offense level of 24 under the guideline to apply. PSR at 20-21.  Hence, as reflected in the

PSR, PSR at ¶ 176, the extraordinary damage that the defendant caused in committing his crimes

was not taken into consideration in determining the defendant's guideline range.  Under USSG §

5K2.5, property loss not taken into account is another encouraged basis for departure.  Moreover,

even if property loss was somehow construed to have already been taken into account in

calculating the defendant's guidelines sentence, a departure or variance may still have been

warranted where, as here, there were either losses of a kind not adequately taken into

consideration under the guidelines, or that existed to a degree substantially in excess of that

ordinarily involved in an arson. USSG § 5K2.0(a)(2) and (3).

Here, the letters in the PSR from both the developer of the Carlisle Condominiums and

the Executive Director of Project Defending Life provide myriad examples of how the losses that

the defendant inflicted upon his victims were exceptional.  For example, the developer of the

Carlisle Condominiums relates in his letter that his entire financial losses were not covered by

insurance.  PSR at 14.  In addition, he explains how, above and beyond the devastating financial

losses he suffered, "over four years and more than 125,000 human hours of labor from hundreds

of dedicated Albuquerque men and women were destroyed" by the fire that the defendant set. *Id.*

He also relates how his efforts at bringing the Carlisle back after the fire cost him dearly from an

emotional, physical and financial standpoint.  *Id.*  In that regard, he expresses how he has "aged

this year unlike any time before."  *Id.* at 16.  Moreover, both he and his wife have spent more

---

million, PSR at ¶ 39, the defendant's base offense level under § 2K1.4(a)(4) would have only
amounted to base offense level 22.

than a year in fear that the fire was a deliberate act toward them, causing them to sleep poorly and purchase a guard dog. *Id.* at 15-16.

Meanwhile, the losses inflicted upon Project Defending Life are also incalculable. That organization is dedicated to serving pregnant women suffering from homelessness, low income and drug addiction. PSR at 18. By helping to address these needs, the organization seeks to provide women at risk with a viable choice not to abort their pregnancies. *Id.* Because of the defendant's actions, however, the organization had to relocate from its ideal location, and devote much of its time and energy to establishing its new, less optimal location, rather than serving women in need. *Id.* at 19. The Executive Director estimates that, as a consequence, the organization was only able to help half the number of women in 2017 that they had been able to help in previous years. *Id.*

In sum, as recited in the PSR, the defendant's violent acts resulted in catastrophic property losses and a toll on a human level that would not have been adequately captured by a sentence governed by the guidelines sentencing range.

### D.  <u>Traditional grounds for varying based upon an endangerment to public safety</u>

The Probation Office correctly notes that departures are also encouraged pursuant to USSG § 5K2.14 if public safety was significantly endangered as a consequence of the offense. PSR at ¶ 179. The Tenth Circuit has further recognized that, in determining whether a case falls within the heartland of an offense, a district court may properly consider the degree of danger to public safety created by the defendant's conduct. *United States v. Jones*, 332 F.3d 1294, 1301 (10th Cir. 2003).[13] Here, the Probation Office correctly points out that the defendant chose to

---

[13] The above said, the United States recognizes that the arson guideline, USSG § 2K1.4(a)(1)(A), will be triggered whenever an offense creates "a substantial risk of death or serious bodily injury to any person other than a participant in the offense [including firefighters], and that risk was

carry out his offenses against several business establishments near the height of the holiday shopping season.  PSR at ¶ 179.  It was therefore reasonable to imagine that someone might have been working late at one or more of the stores that the defendant shot into, which endangered public safety more than if the defendant had struck at some other time of the year.  Perhaps even more dangerously, it is not uncommon for the homeless to seek shelter at night hidden in unoccupied buildings like the Carlisle Condominiums.  It is therefore easy to imagine how the defendant's crimes could have been far more tragic.

### E.  The 3553(a) sentencing factors

 *1.  The nature and circumstances of the offense and the history and characteristics of the defendant*


*Images of Defendant Hickman at the Old Navy store, armed with his assault rifle and handgun*

 "Look yourself in the Fucking Mirror… And ask yourself what are you gonna do about the Worlds Problems..."[14]  That's the message on a handwritten post-it note that agents found at Defendant Hickman's house – a house where agents also discovered parts of an Uzi machine

---

created knowingly."  *Id.*  Here, however, the guideline used for the defendant's case was § 2K1.4(a)(1)(B).  Thus, rather than as a departure, the extreme recklessness that the defendant showed toward human life should be viewed both as a proper consideration under §3553(a)(1), and as a valid ground for variance.

[14] An image of the note is the last image in Exhibit 11b.

gun, a Springfield M1A rifle, boxes of ammunition, a host of bomb-making materials, a draped

room that the defendant obviously used to assemble destructive devices, and military manuals on

guerilla warfare and explosives.  Defendant Hickman's house was a lair, not a home.

Photographs of items found in the defendant's house are attached hereto as Exhibit 11a-b.



*Draped room in Defendant's home where destructive devices could be assembled.*

As discussed above, when he was arrested while fleeing from the Old Navy fire, officers

from the Albuquerque Police Department discovered that defendant was also armed with a

handgun, an assault rifle, a target list, and a box of more improvised liquid containers.

Photographs of items found in the defendant's car are attached hereto as Exhibit 12.

The defendant has chosen to say nothing about the malicious agenda that drove him to

prowl the streets of Albuquerque in the dark of the night, but as reflected in the images above, he

does seem to have revealed his chilling answer to the question he posed to himself.  That answer

appears to have consisted of targeting innocent victims by using his high-powered rifle to blast

his way into buildings so he could burn them down.  The surveillance video excerpts from the

Old Navy store attached hereto as Exhibit 3 perhaps best illustrate the defendant's unconscionable state of mind.  Clad in black garb, one can observe just how deliberate, calm and methodical the defendant was as he threw his improvised liquid containers throughout the store and sought to destroy it – all while making sure that he was still armed with both his handgun and assault rifle, which raises the obvious question of what he had planned to do if he had been confronted in the store.

There is no way that the defendant can ever justify his hateful actions.  Nor does this Court even have the basic comfort of knowing or understanding any of the real or imagined injuries that triggered the defendant's wrath and violent crime spree.  Under the circumstances, the only sure way to address the risks the defendant poses is to impose the maximum period of imprisonment.

## 2.  *The need for the sentence imposed to reflect the seriousness of the offense*

The defendant is a serial arsonist, who left a trail of destruction in his wake.  The property damage he inflicted was catastrophic.  The pictures of each of the arson sites attached hereto as Exhibits 9a through 10d and 13 through 19c show much of the physical damage.  But as revealed by the victims, and as the defendant undoubtedly intended, he also exacted a substantial human cost, which are actions that cannot be undone. For example, the images from the Project Defending Life building reveal that the defendant deliberately targeted their chapel for his ire, apparently starting one fire directly below a statue of the Virgin Mary.  The devastation he left behind changed the trajectory of an organization dedicated to helping women in need.

At each arson site, the defendant appeared to try to do everything he could to stoke a raging fire before he fled. In fact, at the largest fire, it was only through luck, and the skill and

bravery of the Albuquerque Fire Department crews who placed their lives at risk, that the Carlisle Condominiums fire did not spiral out-of-control and destroy other buildings, such as the historic church property located immediately adjacent to the Carlisle Condominiums building. Again, videos attached hereto as part of Exhibit 1 show the conflagration as it consumed the building, while fire crews desperately poured water onto it. The letter attached hereto as Exhibit 20 from the Albuquerque Fire Department outlines how exceptionally dangerous this fire was to residents of Albuquerque, and explains how firefighters were forced to work for several hours in potential collapse zones of the structure at great personal risk. This understated letter reveals just how easily the defendant's hostile campaign could have taken another truly tragic turn.

3.   *The need for the sentence imposed to promote respect for the law*

Imposing a 20-year term of imprisonment would promote respect for the law by sending an unambiguous message that hateful acts of violence and rampant destruction of property that places lives at risk should not, and will not, be tolerated.

4.   *The need for the sentence imposed to provide just punishment for the offense*

As discussed above, standing alone, each of the defendant's arson sites carry a mandatory five-year term of imprisonment, which is a fair and tangible reflection of the seriousness of each of the defendant's offenses. The sum of the damage the defendant inflicted should not be less than its component parts. As discussed above, logic and reason compel the conclusion that each fire should carry progressively more punishment, not progressively less punishment. A 20-year term of imprisonment would be a just and reasonable sentence in this case.

5.   *The need for the sentence to afford adequate deterrence to criminal conduct*

So long as the defendant is imprisoned he will not be able to resume the vicious and hateful campaign he undertook to terrorize residents of Albuquerque. From the standpoint of

general deterrence, a 20-year term of imprisonment would also make clear that arson is not a crime that it pays to commit, particularly where the crime is apparently done to send some sort of malicious message, or to exact some sort of punishment or retribution.

> 6. *The need to protect the public from further crimes of the defendant*

The paramount concern at this juncture must be to protect any number of unknown victims that the defendant may choose to make the target of his wrath in the future.  Imposing anything less than the maximum 20-year term of imprisonment under the plea agreement would mean that the public would have to bear the risk that the defendant might strike again during that time period of leniency.  For many, having the public shoulder that risk would doubtlessly be considered unacceptable.  The defendant has proven himself to be violent and unpredictable. The only way to contain the risk he poses is to impose the maximum permissible sentence. It could very easily prove to have been a reckless gamble, at some potential innocent victim's tragic expense, to assume otherwise.

> 7. *The need to provide restitution to any victims of the offense*

Defendant Hickman will not live enough lifetimes to even begin to repay the victims for the harm he caused to them.

## CONCLUSION

By racing through Albuquerque setting fire after fire, the defendant taxed the resources of both the fire department and law enforcement, who worked overtime trying to catch him in order to protect the residents of our city.  Despite their heroic efforts, the defendant was unfortunately successful in his determination to inflict devastating damage on buildings housing the Carlisle Condominiums, Project Defending Life, Barnes and Noble, Old Navy, Starbucks and Shred-it. The destruction he left behind also changed the trajectory of an organization devoted to helping

women in need.  He placed fear in the hearts of Albuquerque residents in pursuit of some

unknown hateful agenda that he apparently believes justified his actions. For his maliciousness,

the defendant deserves to be severely punished.  And for the dangers he continues to pose, and to

protect the lives and property of innocent people, the defendant needs to be imprisoned for the

maximum time possible under the plea agreement.

Respectfully submitted,

JOHN C. ANDERSON
United States Attorney

*/s/ Electronically filed 04/20/2018*
FRED J. FEDERICI
Assistant United States Attorney
Post Office Box 607
Albuquerque, New Mexico 87102
(505) 346-7274

I HEREBY CERTIFY that I electronically filed
the foregoing with the Clerk of the Court
using the CM/ECF system, which will send
notification to defense counsel.

_____*/s/*_____
FRED J. FEDERICI
Assistant United States Attorney